**GROUP ONE, LTD., Plaintiff–Appellant,**

v.

**HALLMARK CARDS, INCORPORATED, Defendant–Appellee.**

No. 00–1014.

United States Court of Appeals, Federal Circuit.

June 15, 2001.

Rehearing and Rehearing En Banc Denied Aug. 8, 2001.

Richard S. Clark, Baker & Botts, L.L.P., of New York, NY, argued for plaintiff-appellant. With him on the brief was Robert Neuner.

Norman C. Kleinberg, Hughes Hubbard & Reed LLP, of New York, NY, argued for defendant-appellee. With him on the brief were Jeff H. Galloway, and Peter A. Sullivan.

Before LOURIE, Circuit Judge, PLAGER, Senior Circuit Judge,** and GAJARSA, Circuit Judge.

PLAGER, Senior Circuit Judge.

In this patent case, Group One Ltd. ("Group One") sued Hallmark Cards, Inc. ("Hallmark") for infringement of two patents, U.S. Patent No. 5,518,492 (the "'492 patent"), directed to a machine for producing curled and shredded ribbon for decorative packaging, and U.S. Patent No.

** Judge Plager assumed senior status on November 30, 2000.

5,711,752 (the "'752 patent"), directed to a method for producing the curled and shredded ribbon. Group One also claimed that Hallmark had earlier misappropriated its trade secrets regarding the curling and shredding machine and method. Hallmark counterclaimed for a declaratory judgment that Group One's '492 patent was invalid and unenforceable.

Ruling on summary judgment, the district court, Judge Dean Whipple, found that Group One's communications with Hallmark more than one year before the filing date of the application for the '492 patent constituted an offer for sale, and therefore the patent was invalid under 35 U.S.C. § 102(b). *Group One Ltd. v. Hallmark Cards, Inc.*, No. 97–1224–CV–W–1 (W.D.Mo. Sept. 2, 1999). The district court also ruled that Group One's trade secrets ceased to be such on the date on which Group One's Patent Cooperation Treaty ("PCT") patent application was published, and therefore misappropriation damages were limited to any "head-start" advantage Hallmark obtained by using the trade secrets between the date Group One disclosed them to Hallmark and the date the PCT application was published. *Group One Ltd. v. Hallmark Cards, Inc.*, No. 97–1224–CV–W–1 (W.D.Mo. July 29, 1999). Group One subsequently stipulated that it could not prove any such damages, and the misappropriation counts were therefore dismissed. The district court also granted Hallmark's motion for summary judgment on its counterclaim.

Group One appeals the rulings to this court. We affirm the district court's judgment regarding the trade secret issue. However, because we are unable to agree with the district court's analysis of the on-sale bar issue, we reverse that part of the judgment and remand to the district court for further proceedings. The grant of the counterclaim, based on the on-sale bar, falls with it; the judgment on the counterclaim is vacated.

## BACKGROUND

Group One is a corporation registered in the United Kingdom. The Managing Director and sole beneficial shareholder of Group One is Frederic Goldstein, a United States citizen residing in Sweden. Goldstein is the named inventor on the '492 patent and the '752 patent. Hallmark is a Missouri corporation headquartered in Kansas City, Missouri.

On November 14, 1991, Goldstein filed a patent application in the United Kingdom for an automated ribbon curling and shredding device. On November 12, 1992, Goldstein filed a patent application with the European Patent Office under the Patent Cooperation Treaty ("PCT"), designating, among other countries, the United States. Pursuant to the PCT, this application was published on May 27, 1993, 18 months after the filing date in the United Kingdom. Goldstein subsequently filed a U.S. patent application corresponding to the PCT application on May 13, 1994. This application eventually issued as the '492 patent on May 21, 1996. A continuation of this U.S. application issued as the '752 patent on January 27, 1998.

The '752 patent claims a method for curling and shredding ribbon on a mass basis, and the '492 patent claims a machine for performing the method. Prior to Goldstein's conception, ribbon had been sold in a form that was suitable for curling, but was not so curled until curled by the consumer. Goldstein perceived a market for pre-curled ribbon—for use, for example, as filler in a gift package or gathered in a bow—and conceived the inventions of the '492 patent and '752 patent to exploit that market.

Before filing his PCT application, Goldstein attempted to generate interest in his device, commencing a series of communications with Hallmark (and others). On June 24, 1991, he wrote to Hallmark: "We have developed a machine which can curl and shred ribbon so that Hallmark can produce the product you see enclosed—a bag of already curled and shredded ribbon. . . . We could provide the machine and/or the technology and work on a license/royalty basis." Hallmark expressed some interest, and the parties continued their correspondence.

Hallmark and Goldstein arranged a meeting to discuss details of the curling and shredding machine for February 17, 1992. Prior to the meeting, the parties negotiated a Confidential Disclosure Agreement ("CDA") regarding the technology to be discussed at the meeting. However, despite essential agreement on the terms of the CDA, Hallmark never signed it. On February 14, 1992, shortly before the scheduled meeting, Goldstein had a telephone conference with a Hallmark engineer, in which the parties discussed details of Group One's machine and method. At the time, Goldstein had signed the CDA and (incorrectly) believed it to be in effect. Hallmark then cancelled the planned February 17 meeting, deciding it would instead evaluate its own internal capability of producing a curling and shredding machine.

On June 6, 1992, Hallmark sent a letter to Goldstein indicating that it had "developed our own machine for curling and shredding ribbon, and therefore we are not presently interested in purchasing such a machine from your firm." The letter went on to state "we would like to thank you[r] firm for suggesting the curled ribbon product to us by paying you $500." Apparently anticipating a claim of misappropriation, the letter specifically pointed out that Hallmark had never signed the CDA "pending our internal consideration of such product," and requested that Goldstein sign a release "on account of our use of the curled ribbon idea" in return for the $500 payment. The letter makes no mention of the telephone conference of February 14, 1992 or the information Hallmark obtained during the conference. Goldstein declined the $500 and did not sign the release.

According to Hallmark, the company temporarily abandoned the project and did not again begin developing a fully suitable curling and shredding machine until April 1994. Sometime in March or April 1995, it began producing its "Curl Cascade" product, which is a clump of curled ribbon attached to a card, and its "Curl Fill" product, which is a gift-bag stuffing comprised of strands of curled ribbon. The machine used to make these products, the Curl Cascade machine, is the subject of the present suit.

On August 4, 1997, Group One filed suit in the Western District of Missouri. The final amended complaint had four counts, two for patent infringement and two relating to theft of trade secrets. Count I alleged infringement of the '492 patent and Count II alleged infringement of the '752 patent. Count III alleged misappropriation of trade secrets, and Count IV claimed unjust enrichment due to the misappropriation.

With respect to the patent counts, Hallmark moved for summary judgment of invalidity under 35 U.S.C. § 102(b), on the grounds that the patented machine and method had been "on sale" more than one year prior to the filing date of the application. Under 35 U.S.C. § 363, the United States filing date, for § 102(b) purposes, of a patent application filed under the PCT in which the United States is designated, is the date of the PCT application—in this

case, November 12, 1992. Thus the "critical date" is November 12, 1991.

The court concluded that, while the pre-critical–date communications between Group One and Hallmark did not constitute a formal offer for sale in the contract sense, they did constitute an offer for sale in the § 102(b) on-sale bar context. The court therefore ruled that the '492 patent and the '752 patent were invalid, and dismissed the patent counts.

The district court also decided the trade secret counts. Ruling on Hallmark's motion for summary judgment, the district court noted that Hallmark did not deny the existence of trade secrets or a confidential relationship between Hallmark and Group One. Hallmark did argue that the relationship was governed by the CDA, but the district court rejected this contention because Hallmark had never signed the CDA. The district court concluded that under Missouri common law (which the parties agreed applied, since Missouri did not adopt the Uniform Trade Secrets Act until 1995, and the adoption was specifically not to be applied retroactively), any possible misappropriation ended with the publication of the PCT application on May 27, 1993. After this date, the information was no longer secret because it had been made available to the public. The district court did rule, however, that Group One could recover for any "head-start" advantage gained by Hallmark because it had improperly used the confidential information during the period prior to the PCT publication date. Group One subsequently stipulated that it could prove no such damages and the trade secret counts were also dismissed.

Group One now appeals the rulings by the district court, alleging that the court erred in declaring its patents invalid and in limiting its recovery for Hallmark's misappropriation of its trade secrets to pre-

publication head-start damages. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

### I.

In reviewing a district court's grant of summary judgment, we must make an independent determination as to whether the standards for summary judgment have been met. *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). We view the evidence in a light most favorable to the non-movant, and draw all reasonable inferences· in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116, 227 USPQ 577, 581 (Fed.Cir.1985) (en banc). A motion for summary judgment is properly granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### II.

#### A.

██ "A person shall be entitled to a patent unless ... (b) the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Application of the on-sale bar is a question of law, and we review the district court's ultimate conclusion of invalidity without deference. *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 889, 51 USPQ2d 1470, 1471 (Fed.Cir.1999). An accused infringer, challenging a presumptively valid patent, *see* 35 U.S.C. § 282, must demonstrate by clear and convincing evidence that "there was a definite sale or offer to sell more than one year

before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention." *UMC Elecs. Co. v. United States,* 816 F.2d 647, 656, 2 USPQ2d 1465, 1472 (Fed.Cir.1987). Since all agree there was no sale of the invention before the critical date, the question is whether there was an offer to sell it.

## B.

In the case before us, the district court reviewed the correspondence between Group One and Hallmark to determine whether Group One had made a "definite ... offer to sell" the subject matter of the '492 and '752 patents. It concluded that the correspondence did not rise to a formal offer in the contract sense, but that Group One had nevertheless made an offer for sale that was sufficiently definite to give rise to the on-sale bar.

In reaching this conclusion, the district court relied heavily on language in *RCA Corp. v. Data General Corp.,* 887 F.2d 1056, 12 USPQ2d 1449 (Fed.Cir.1989). In *RCA,* this court stated:

> RCA is correct that, where there is no sale, a definite offer to sell is an essential requirement of the on-sale bar; however RCA misinterprets that requirement. The requirement of a definite offer excludes merely indefinite or nebulous discussions about a possible sale. While this requirement may be met by a patentee's commercial activity which does not rise to the level of a formal "offer" under contract law principles, a definite offer in the contract sense clearly meets this requirement.

*Id.* at 1062, 12 USPQ2d at 1154 (citations omitted).

In *RCA,* the court found that the offer at issue could have been "accepted" and therefore was in fact an offer in the contract sense, thus meeting the criterion stated in the first sentence quoted above (as well as in the last clause of the third sentence). *Id.* The further assertion, in the first part of the third sentence, to the effect that an offer for sale need not "rise to the level of a formal 'offer' under contract law principles," was unnecessary to the decision in the case, and thus is non-binding *dictum.* Moreover, the parties have cited no other Federal Circuit cases since *RCA* that have actually found an offer to be an offer for sale for § 102(b) purposes unless the offer was a formal offer in the contract sense. In short, there is no binding precedent in this circuit that requires us to accept something less than an offer to contract as constituting an offer for sale as that term is construed for purposes of the on-sale bar of 35 U.S.C. § 102(b).

Furthermore, to the extent it was believed that something less than an offer to sell as understood in general commercial transactions was sufficient to trigger the on-sale bar, it is likely that such belief can no longer be the law. The Supreme Court in *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d 1641 (1998), swept away this court's "totality of the circumstances" analysis of the on-sale bar and replaced it with a two-part test: "First, the product must be the subject of a commercial offer for sale.... Second, the invention must be ready for patenting." *Id.* at 67, 119 S.Ct. 304, 48 USPQ2d at 1646–47. Though the Court did not elaborate on what was meant by "a *commercial* offer for sale"— the issue not being directly presented—the language used strongly suggests that the offer must meet the level of an offer for sale in the contract sense, one that would be understood as such in the commercial community. Such a reading leaves no room for "activity which does not rise to

the level of a formal 'offer' under contract law principles." [1]

Applying established concepts of contract law, rather than some more amorphous test, implements the broad goal of *Pfaff*, which, in replacing this court's "totality of the circumstances" test with more precise requirements, was to bring greater certainty to the analysis of the on-sale bar. *See* 525 U.S. at 65–66 & n. 11, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1646 & n. 11. Courts are quite accustomed to and comfortable with determining whether a particular communication or series of communications amounts to an offer in the contract sense, and that type of determination is well established in law. In contrast, the *dictum* test suggested in *RCA*, under which something less than a formal commercial offer could still be an offer for purposes of the on-sale bar, opens up a vast sea of uncertainty, and requires a whole new mode of analysis, one whose parameters remain ill-defined.

In the case before us, the district court first considered whether the correspondence between the parties, prior to the critical date, amounted to an offer in the formal, commercial contract sense. It analyzed the issue under Missouri law and concluded that the correspondence between Group One and Hallmark did not amount to an offer in the commercial contract sense. The district court based its conclusion on the indefinite nature of the communications between the parties and the lack of specific terms such as price and quantity, finding that these factors suggested preliminary proposals or invitations to negotiate, rather than a formal offer. However, the district court then went on to find that, under the *RCA* formulation, the correspondence nonetheless constituted a sufficient offer for sale for purposes of § 102(b), and therefore invalidated the patent.

■ In the first place, the court erred in applying the law of Missouri to the question. Because of the importance of having a uniform national rule regarding the on-sale bar, we hold that the question of whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law, to be analyzed under the law of contracts as generally understood. To hold otherwise would potentially mean that a patent could be invalid in one state, when the patentee's actions amounted to an offer under the laws of that state, and valid in a second state, when the same actions did not amount to an offer under the laws of that second state. Such a result is clearly incompatible with a uniform national patent system.

■ As a general proposition, we will look to the Uniform Commercial Code ("UCC") to define whether, as in this case, a communication or series of communications rises to the level of a commercial offer for sale. As this court has previously pointed out, "[t]he UCC has been recognized as the general law governing the sale of goods and is another useful, though not authoritative, source in determining the

---

1. For recent commentary on this point, see William C. Rooklidge & Russell B. Hill, *The Law of Unintended Consequences: The On Sale Bar After Pfaff v. Wells Electronics*, 82 J. Pat. & Trademark Off. Soc'y 163, 174–75 (2000) ("If [*Pfaff*'s] 'commercial offer for sale' is read to mean a formal offer in the contract sense, then *RCA* and its progeny are in jeopardy.... [This reading may prevail given that *Pfaff*'s] discussion of the offer to sell focuses on the elements of formal offer in the contract sense, rather than on the less formal activities as discussed in *RCA*."); Katherine Kelly, *Cases and Recent Developments/Patents*, 8 Fed. Cir. B.J. 57, 74 (1999) ("Still open for debate is whether the 'subject of a commercial offer for sale' prong of *Pfaff* will be interpreted as requiring an offer of specific contractual terms, or whether it will be applied more broadly.").

ordinary commercial meaning of" terms used by the parties. *Enercon GmbH v. Int'l Trade Comm'n,* 151 F.3d 1376, 1382, 47 USPQ2d 1725, 1729 (Fed.Cir.1998). The Supreme Court's formulation of a *"commercial* offer for sale" in *Pfaff* also supports consulting the UCC. The Supreme Court has also cited the Restatement of Contracts with approval in the commercial contract law context. *See Mobil Oil, Inc. v. United States,* 530 U.S. 604, 606–10, 120 S.Ct. 2423, 2429–30, 147 L.Ed.2d 528 (2000).

■ After reviewing the district court's contract analysis under Missouri law and the proper analysis under these generally understood rules governing contracts, we conclude that the district court's error in this case is harmless. We perceive no meaningful difference in the court's analysis under Missouri law and the analysis that would pertain under these general sources. Here, the district court used the UCC as one of its guides in reaching its conclusions on this point. Our analysis of the facts leads us to the same conclusion reached by the district court—the correspondence and other interactions between Group One and Hallmark prior to the critical date did not add up to a commercial offer to sell the invention, an offer, for example, which Hallmark could have accepted.

■ As noted, the district court then went on and found that, under the *RCA* formulation, the correspondence nonetheless constituted a sufficient offer for sale for purposes of § 102(b), and therefore invalidated the patent. For the reasons explained, this conclusion was incorrect as a matter of law. Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b).

■ We do not mean to suggest that it will always be easy to ascertain whether a set of interactions between parties constitutes a commercial offer to sell. Nor do we propose to offer rules or even binding guidance for making such determinations, which offer would be little more than *obiter dicta.* We do note in passing that contract law traditionally recognizes that mere advertising and promoting of a product may be nothing more than an invitation for offers, while responding to such an invitation may itself be an offer. *Restatement (Second) of Contracts* § 26 (1981). In any given circumstance, who is the offeror, and what constitutes a definite offer, requires looking closely at the language of the proposal itself. Language suggesting a legal offer, such as "I offer" or "I promise" can be contrasted with language suggesting more preliminary negotiations, such as "I quote" or "are you interested." Differing phrases are evidence of differing intent, but no one phrase is necessarily controlling. *Id.* §§ 24, 26. Fortunately, as earlier noted, there is a substantial body of general contract law, widely shared by both state and federal courts, to which courts can resort in making these determinations. *See generally, e.g.,* Arthur Linton Corbin, *Corbin on Contracts* (1964); John D. Calamari & Joseph M. Perillo, *The Law of Contracts,* (4th ed.1998).

On appeal here, the parties do not dispute the conclusion by the district court, with which we agree, that no such commercial offer to sell was made. Rather, they focus on whether the correspondence meets the lesser *RCA* standard. As we have said, that no such commercial offer was made disposes of the matter. Thus, because there was no commercial offer for sale, the patent cannot be invalid under the on-sale bar of § 102(b).

Group One raises an alternative theory for why there is no on-sale bar in this case. Group One contends that it was offering only to license the patent to Hallmark, and was not offering to license or sell the invention as such. There is precedent in this court to the effect that a sale of rights in a patent, as distinct from a sale of the invention itself, is not within the scope of the statute, and thus does not implicate the on-sale bar. *See Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1216, 48 USPQ2d 1010, 1019 (Fed.Cir. 1998) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1267, 229 USPQ 805, 809 (Fed.Cir.1986)). Hallmark counters that the correspondence demonstrates that Group One was actually offering to license (*i.e.*, sell rights to use) the machine itself, and not just rights in the patent on the machine.

■ The various documents that passed between the parties leave the answer to this conundrum unclear. The district judge concluded that Group One's efforts were for the purpose of selling Goldstein's invention—either his machine or the technology to build his machine—and not an effort to sell rights to his patent. The district judge erred in deciding this disputed question of fact on summary judgment. Further, even treating the matter as properly decided on summary judgment, we must view the evidence in a light most favorable to the non-movant; in that light, we are inclined to the view that Group One's understanding of the transaction

must prevail for purposes of the summary judgment analysis.

Be that as it may, our disposition of the on-sale bar issue as explained above relieves us of having to further address this question.[2] Similarly, we need not address Group One's contention that the offer failed the second prong of *Pfaff*, namely that the invention was not "ready for patenting" at the time the supposed offer was made. *Pfaff*, 525 U.S. at 67, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1647.

We therefore reverse the district court's judgment that the patent was invalid under 35 U.S.C. § 102(b) because the invention was on sale more than one year before the filing date of the application for patent. The summary judgment in favor of Hallmark on the counterclaim, based on the same grounds, is accordingly vacated. The matter is remanded for further proceedings consistent with this opinion. We note that the district court in its thorough opinion presented its claim construction determination, but the parties' briefs have not discussed this construction and therefore we will not address that matter here.

### III.

#### A.

Group One's trade secret claims are governed by state law. In the present case, the parties agree that the relevant law is that of Missouri, and the district court applied Missouri law. Missouri adopted the Uniform Trade Secrets Act in 1995, but the Act specifically states: "With re-

---

**2.** In his "Additional Remarks," Judge Lourie discusses the relationship between a "license," which he attributes uniquely to rights in a patent, and a "sale," which he views as any transaction related to the invention itself, which in this case is a machine. Of course, a sale of an interest that entitles the purchaser to possession and use of the machine, unrelated to any patent present or future, could be

couched as a "license"; such labeling would not prevent the transaction from triggering the on-sale bar, all other requirements being met. His conclusion that the proposal here was with regard to a license under the eventual patent is consistent with our giving Group One the benefit of the doubt on summary judgment, though it is not an issue we need or can decide on appeal.

spect to a continuing misappropriation that began prior to August 28, 1995, [the Act] shall not apply to the continuing misappropriation that occurs after such date." Mo. Rev.Stat. § 417.467. Since all relevant acts in the present case began before that date, Missouri common law applies.

### B.

The key dispute between the parties is what view Missouri takes of trade secret law. Group One urges what it calls an "equitable" theory, and which the district court called the "relationship" theory. Under this theory, the harm being remedied is the misappropriation itself—in this case, Hallmark's use of Group One's confidential disclosures to construct its Curl Cascade machine—which is a violation of the confidential relationship. The subsequent publication of the formerly secret material is deemed irrelevant unless the misappropriating party becomes aware of the publication and relies on that publication, rather than on the confidential disclosure. In the present case, Hallmark does not contest that it did not learn of the published PCT application until this litigation, well after it designed its machine. Under these facts, according to Group One, Hallmark should be liable for its misappropriation.

Group One relies primarily on *Goldberg v. Medtronic, Inc.*, 686 F.2d 1219, 216 USPQ 89 (7th Cir.1982). In *Goldberg*, the Seventh Circuit, interpreting Minnesota law, put the focus on the breach of confidence, rather than encroachment on a property right. The court followed previous decisions in Minnesota and other jurisdictions that it read as holding:

> [T]he existence of public disclosures is relevant only so far as the defendant actually relied upon them. . . . [O]ne who breaches an obligation of confidence and uses confidential information to the own-

er's detriment is liable despite the fact that the information could have been lawfully obtained.

*Id.* at 1227, 686 F.2d 1219, 216 USPQ at 94–95 (citing, *inter alia, Servo Corp. of Am. v. Gen. Elec. Co.*, 393 F.2d 551, 555 (7th Cir.1968)). Also to the same effect is *Smith v. Dravo Corp.*, 203 F.2d 369, 375, 97 USPQ 98, 102–03 (7th Cir.1953) ("[T]he mere fact that such lawful acquisition was available does not mean that [a defendant] may, through breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis." (applying Pennsylvania law)).

Hallmark, on the other hand, urges a more strict interpretation of what constitutes a trade secret. According to Hallmark, once formerly secret material is published, it ceases to be a secret, and therefore it cannot be misappropriated—regardless of whether the party accused of misappropriation was aware of the publication. (The district court referred to this view as the "property" theory of trade secrets.) Absent a protectable trade secret, Hallmark can have no liability.

Hallmark points out that the Supreme Court of Minnesota specifically criticized *Goldberg*'s interpretation of Minnesota law, stating "we disagree with the holding in *Goldberg* . . . ." *Electro Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 n. 5, 220 USPQ 811, 816 n. 5 (Minn. 1983). Furthermore, the Supreme Court of Pennsylvania rejected *Smith v. Dravo*'s interpretation of Pennsylvania law, stating:

> We feel that the authorities holding that public disclosures destroy plaintiff's right to maintain a cause of action to preserve his trade "secret" as against a competing former employee who has violated a duty of confidence are more sound in theory and practice than those continuing to look to the relationship of the parties as a basis for the action. . . .

The starting place in every case of this sort is not whether there was a confidential relationship, but whether, in fact, there was a trade secret to be misappropriated. *Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 419 Pa. 248, 213 A.2d 769, 780, 147 USPQ 221, 229 (Pa.1965) (footnote omitted). Hallmark also suggests that Missouri law follows these decisions rejecting the *Goldberg* formulation.

The district court was unable to find any Missouri law that was directly on point on the question of which theory applied in Missouri. It concluded that, if presented with the question, the Missouri Supreme Court would adopt the property theory. Under the property theory, the district court found that the publication of the PCT application on May 27, 1993 destroyed the trade secret status of the confidential disclosures, and therefore Hallmark could not be liable for any activity after that date. The court did hold that Hallmark would be liable for damages for any "head-start" it obtained by having access to the confidential information in the time period between the date of the confidential disclosure and the date of the PCT publication, and reserved that issue for trial. Group One subsequently stipulated that it would be unable to prove any such damages, and the counts were then dismissed.

The district court's understanding of Missouri's view on the law of trade secrets is a matter of law, which we review without deference to the district court. See *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). As the District Court noted, the Missouri courts have not opined on the issue in the context here. What we can glean from the law that does exist from the state of Missouri is consistent with the district court's interpretation. We find

particularly relevant *Reddi–Wip, Inc. v. Lemay Valve Co.*, 354 S.W.2d 913 (Mo.Ct. App.1962), in which the Missouri court of appeals specifically rejected the doctrine of *Smith v. Dravo*, at least on the facts of that case and arguably as a general principle, stating:

> In general, the doctrine upon which [the *Smith v. Dravo* ] line of cases rests was declared by Judge Learned Hand as one for which "... we can find no support in principle...." *Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150, 156[, 80 USPQ 108, 113 (2d Cir.1949) ]. We are of the opinion that the rule applied in *Smith v. Dravo, supra*, is not applicable to a case where, as here, defendants' knowledge of plaintiffs' trade secrets was acquired during a normal, albeit confidential[,] relationship, which has long since ceased, and the use of the alleged trade secrets occurred a substantial length of time after their voluntary disclosure by the issuance of patents to plaintiffs.

354 S.W.2d at 918; *see also Carboline Co. v. Jarboe*, 454 S.W.2d 540, 165 USPQ 521 (Mo.1970); *Nat'l Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 152 USPQ 120 (Mo. 1966).

Group One correctly points out that these Missouri cases, as well as the other cases cited by the district court, all addressed trade secrets in the context of a former employee. In such a context, the right of the ex-employee to use the general knowledge he or she obtained while employed was a substantial countervailing factor to the employer's right of secrecy. According to Group One, no such countervailing considerations are implicated in the present case, and therefore the proper approach is to follow *Goldberg* and *Smith v. Dravo*, both of which were like the present case in that they did not involve an employee/employer relationship. While this

argument is not without force, we find no such distinction made in existing Missouri law. In the absence of any suggestion in that law to make such a distinction, we are of the view that the District Court correctly determined the likely thrust of the state's law.

Hallmark also urges us to affirm the district court on the alternate ground that the confidential relationship between Group One and Hallmark is governed by the CDA, despite the fact that Hallmark never signed the CDA. Under Hallmark's interpretation of the CDA, its actions did not effect a misappropriation. We see no cause to overturn the district court's well reasoned rejection of that position. In any case, our holding regarding the effect of the 1995 publication of the PCT application renders the CDA issue moot.

We therefore affirm the judgment of the district court on the trade secret misappropriation and unjust enrichment counts.

## CONCLUSION

The judgment of the district court is

*AFFIRMED–IN–PART, REVERSED–IN–PART, VACATED–IN–PART, and REMANDED.*

LOURIE, Circuit Judge, additional remarks.

I join the majority opinion, but write separately to address what the majority refers to as an alternative theory as to why the on-sale bar should not apply. I believe the offers here did not show that there was a definite offer for sale of the claimed inventions, as required by our precedent. What was offered was a license under whatever patents were obtained on the invention. It is clear that Mr. Goldstein intended to patent his invention, as the record shows that he sent drawings to his attorney no later than June 27, 1991.

Although the majority asserts that I consider the term "license" to refer "uniquely" to rights under a patent, which I do not, it is clear from the facts that the license contemplated here did relate to patents.

The communications from Goldstein attempting to interest Hallmark in his invention unmistakably bore the marks of an offer to license the invention rather than an offer to sell it. There is a difference, and the difference is relevant to on-sale law. The communications did offer to "provide the machine," but those offers were accompanied by language indicating that it was to be provided on a "license/royalty basis." There is no indication that the machine Goldstein intended to patent was to be sold. No price was specified, no date of delivery. It is true that, in a letter from Goldstein to Hallmark, Goldstein stated that Group One "only offered to sell Hallmark the machine." However, it is clear from that document that the comment related to the distinction between the machine and ribbon curled by the machine. That reference to selling does not override the frequent references to providing the machine on a license/royalty basis.

We have held in *Mas–Hamilton* that providing a machine to a potential customer with an offer to convey "production rights" or the "right to market the invention" does not constitute an offer to sell the invention that violates the on-sale bar. *Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1217, 48 USPQ2d 1010, 1019 (Fed.Cir.1998). That is because a license under a patent is not usually a sale of the patented product, and the statute bars a sale, not a license. A license is analogous to granting or waiving rights under *the patent,* which is distinct from selling *the machine* covered by the patent.

A patent license, if it is non-exclusive, is an agreement to forbear from suit. If the

license is exclusive, it may be tantamount to an assignment of the patent. In neither case is the invention of the patent necessarily on sale when the license is executed. In fact, if a license were equivalent to a sale for purposes of the on-sale bar, many patents would be invalidated long before the invention itself is put on sale because the grant of licenses often long precedes commercialization by sale of the invention. The law does not start the on-sale bar clock running when a license to an invention is executed.

The on-sale bar is intended to limit the time for an inventor to commercialize an invention before filing a patent application. The statute refers to a patented invention itself being on sale, not to an agreement with another party concerning the commercialization of the invention at some future time, following which the invention would then be placed on sale. An important consequence of the distinction between the sale and the license of a patented machine is thus the time at which the on-sale clock starts running. With a license, the licensee of a machine would not normally be able to immediately begin commercialization of the invention, whereas if the machine had been sold, the sale itself is the commercialization that starts the on-sale clock running. How long Hallmark, the potential licensee in this case, would have taken before it could have put the invention into commercial use is not known. But it would not have been immediate, whereas the sale of the machine, had it occurred, would have been immediate.

There may be instances in which a license is tantamount to a sale, and in which a bar may arise from a license. When a product, such as a computer program, is transferred to a customer in a transaction that is tantamount to a sale, the transaction may under commercial law nevertheless still be a license. The transaction is structured as a license (a "shrink wrap" license) so that the seller can restrict what the "buyer" does with the program, in particular, to ensure that it is not duplicated and distributed to others who have not paid the seller for the product. The product is, however, just as immediately transferred to the "buyer" as if it were sold. Notwithstanding the provisions of such a license, it is not contemplated that the product will ever be returned to the seller.

This is not such a case. The license offered here, in contrast to an offer for sale of the patented machine, contemplated that Hallmark go into the business of using the patented machine and method to curl ribbon, which Hallmark would then sell. The on-sale bar was not triggered by the offered license. Thus, I would hold that no on-sale bar occurred for the additional reason that the proposal for a business arrangement between Goldstein and Hallmark was an offer to grant a license under the eventual patent, not an offer to sell the patented machine.