## MOLDFLOW CORPORATION and Moldflow Ireland, Ltd., Plaintiffs

v.

## SIMCON, INC., and Simcon Kunststofftechnische Software, GmbH Defendants.

### No. CIV.A.02–12123–RCL.

United States District Court, D. Massachusetts.

Dec. 22, 2003.

---

Steven M. Bauer, John J. Cotter, Joel E Lehrer, Christopher W. Stamos, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for Moldflow Corporation, Moldflow Ireland, Ltd., Plaintiffs.

Edwin J. Carr, Carr & Liston, Boston, MA, Howard J. Castleman, Murtha Callina LLP, Boston, MA, Ralph W. Selitto, Jr., Paul F. Swift, McCarter & English, Newark, NJ, John C. Wyman, Murtha Cullina, LLP, Boston, MA, for Simcon Kunststofftechnische Software GmbH, Simcon, Inc., Defendants.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

LINDSAY, District Judge.

### I. Introduction

The plaintiffs, Moldflow Corp. and Moldflow Ireland, Ltd. (collectively "Moldflow" or the "plaintiffs"), filed suit in this court, alleging patent infringement by the defendants, Simcon, Inc. and Simcon Kunststofftechnische Software GmbH (collectively "Simcon" or the "defendants"). The defendants responded by filing a motion to dismiss the complaint for lack of personal jurisdiction and improper venue. This memorandum and order addresses Simcon's motion to dismiss.

### II. Facts and Procedural History

According to the complaint, on August 1, 2000, the United States Patent and Trademark Office issued the patent that has become the subject of this litigation. *See* Compl. ¶ 7. That patent was assigned the patent number 6,096,088, and entitled "Method for Modelling [sic] Three Dimension Objects and Simulation of Fluid Flow" (the " '088 patent"). *See id.* The plaintiffs claim that they have exclusive rights to the '088 patent in the United States, including the right to enforce it. *See id.* The plaintiffs further claim that, without authorization, Simcon has "made, used, imported, sold, and/or offered for sale" in the United States, including in this district, simulation software products that infringed the '088 patent. *See id.* ¶¶ 12, 16. Accordingly, the plaintiffs seek a declaratory judgment, injunctive relief, and damages against Simcon. *See id.*

In support of their motion to dismiss for lack of personal jurisdiction, the defendants have submitted an affidavit executed by Dr. Paul Filz, the Managing Director of Simcon Kunststofftechnische Software GmbH, and President, Treasurer and Secretary of Simcon, Inc. *See* Memorandum of Law in Support of Motion to Dismiss, Ex. A ("Filz Aff."). In that affidavit, Dr. Filz states that "Simcon has no offices, no representatives, no realty, no personalty, no bank accounts, no presence whatsoever in the Commonwealth of Massachusetts." Filz Aff. ¶ 8. In addition, he asserts that "Simcon is not registered to do business in the Commonwealth of Massachusetts, and based upon [a] review [of its invoice files], has not transacted business in the Commonwealth of Massachusetts, nor sold any products or services to any person or entity in the Commonwealth of Massachusetts since at least January 1997." *Id.* ¶ 10. Finally, while admitting that Simcon recently retained the services of a Connecticut company called Kruse Analysis to do "limited marketing by mail and/or email," Dr. Filz concludes that, "[t]o my knowledge, no products or services originating from Simcon have reached the Commonwealth of Massachusetts, including the [al-

legedly infringing] products identified above." *Id.* ¶ 11.

In their opposition to the motion to dismiss, the defendants challenge Dr. Filz's claim that none of Simcon's allegedly infringing activities occurred in Massachusetts. *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint ("Plaintiffs' Opposition"). To support that challenge, the defendants proffer the affidavit of Glenn Longwell, Moldflow's Regional Sales Manager for the geographic area that includes Massachusetts. *See* Plaintiffs' Opposition, Ex. A ("Longwell Aff."). In that affidavit, Mr. Longwell relates a conversation he had with Brian Zajas, *see* Longwell Aff. ¶¶ 6–7, an employee of Nypro, Inc., one of Moldflow's Massachusetts customers. *See id.* Mr. Longwell claims that, during a visit to Nypro on or about October 22, 2002, Mr. Zajas told him that Torsten Kruse from Kruse Analysis had contacted Nypro by telephone and through direct mailings earlier in that month. *See id.* According to the affidavit, Mr. Zajas also told Mr. Longwell that "Mr. Kruse solicited business from Nypro on behalf of Simcon, specifically offering for sale the [allegedly infringing] products." *Id.* ¶ 8. As evidence of Simcon's solicitations, Mr. Zajas "provided copies of three brochures that were received by Nypro on or about the 1st of October, 2002 from Mr. Kruse." *Id.* ¶ 9. Mr. Longwell attached photocopies of those brochures to his affidavit. *See* Longwell Aff., Exs. 1–3. The plaintiffs argue that these contacts with Massachusetts are sufficient to support personal jurisdiction over the defendants.

On June 26, 2003, I ordered expedited discovery on the limited issue of whether this court could exercise personal jurisdiction over Simcon. In accordance with that order, discovery proceeded. As a result of their discovery efforts, the plaintiffs have unearthed two additional pieces of information concerning Simcon's presence in Massachusetts.

First, invoices produced by Simcon and the deposition testimony of Dr. Filz show that, during the past ten years, Simcon has made at least two sales of its products and/or services to customers in the Commonwealth of Massachusetts. *See* Plaintiffs' Second Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint ("Plaintiffs' Second Opposition"), Ex. A ("Filz Dep."). It appears from information contained in an invoice that one of those sales, to Tyco Healthcare in Mansfield, Massachusetts, included the provision of data generated through the use of one of Simcon's allegedly infringing software programs. *See* Filz Dep., Ex. 9. Dr. Filz testified at his deposition, however, that the invoice is in error, and that the data were actually compiled through the use of modeling software in the public domain. *See id.* at 165:9—167:21. The other sale, to GE Plastics in Pittsfield, Massachusetts, occurred in 1994, six years before the issuance of the '088 patent. *See id.* at 30:1–14.

Second, the defendants obtained an affidavit from Mr. Kruse, who confirmed therein that Kruse Analysis contacted Nypro by means of email and direct mail, as part of "preliminary marketing efforts" to solicit business on behalf of Simcon in connection with its allegedly infringing software products. *See* Plaintiffs' Second Opposition, Ex. D ("Kruse Aff."). Moreover, Mr. Kruse declared that "[a]s part of my preliminary marketing efforts, I also e-mailed and mailed flyers to [ ] ten [additional] Massachusetts companies." Kruse Aff. ¶ 10. He stated that, in total, Kruse Analysis "sent out these preliminary marketing materials to at least 200 (two hundred) companies in the United States and Canada during 2002." *Id.* ¶ 11. According to Mr. Kruse's affidavit, Kruse Analysis continued its marketing efforts on be-

half of Simcon until October 31, 2002, when Dr. Filz of Simcon telephoned Mr. Kruse and instructed him to cease marketing Simcon's software products. *See id.* ¶ 12.

The defendants argue that none of the information proffered by the plaintiffs establishes contacts in Massachusetts sufficient to confer personal jurisdiction over Simcon in this district. *See* Defendants' Response to Plaintiffs' Second Opposition to Motion to Dismiss.

## III. Discussion

### (a) Burden of Proof

■ When a defendant moves to dismiss an action for lack of in personam jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "[t]he plaintiff bears the burden of proving the court's personal jurisdiction over the defendant." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 50 (1st Cir.2002). In determining whether the plaintiff has met its burden, the court has three different methods at its disposal. *See Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 145 (1st Cir.1995); *Boit v. Gar–Tec,* 967 F.2d 671, 675–78 (1st Cir.1992).

Under the first of these methods, known as the *"prima facie"* test, the district court "consider[s] only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Boit,* 967 F.2d at 675; *see also U.S. v. Swiss American Bank, Ltd.,* 274 F.3d 610, 618–19 (1st Cir.2001). The second method, referred to by the First Circuit as the "preponderance of the evidence" test, places a much higher evidentiary burden on the plaintiff. *See Foster–Miller,* 46 F.3d at 145. Use of that test "necessitates a full-blown evidentiary hearing at which the court will adjudicate the jurisdictional issue definitively before the case reaches trial." *Id.* at 146. The third method, which the First Circuit has labeled the "likelihood" standard, permits the court to steer a middle course between the *"prima facie"* and "preponderance of the evidence" tests. *See Boit,* 967 F.2d at 677. Like the "preponderance of the evidence" test, the "likelihood" test requires the court to conduct an evidentiary hearing and engage in differential factfinding. *See id.* However, because factual determinations under this intermediate approach are "limited to probable outcomes as opposed to definitive findings of fact," the "likelihood" standard avoids binding adjudications and allows the court to " 'merely find whether the plaintiff has shown a likelihood of the existence of each fact necessary to support personal jurisdiction.' " *Foster–Miller,* 46 F.3d at 146 (quoting *Boit,* 967 F.2d at 677).

The *"prima facie"* test is "the most commonly used method of determining a motion to dismiss for want of personal jurisdiction ...," *Boit,* 967 F.2d at 675, and the default standard for judging whether a plaintiff has met its burden. *See id.* at 677 ("Concerns about troublesome implications of preponderance-of-the-evidence findings weigh heavily in favor of determining a motion to dismiss on the *prima facie* standard."). By contrast, the other two methods are only applicable in circumstances where "it is unfair to force an out-of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more from the plaintiffs than a *prima facie* showing of facts essential to in personam jurisdiction." *Id.* at 676. Examples of such circumstances are "when the proffered evidence is conflicting and the record is rife with contradictions, or when a plaintiff's affidavits are patently incredible." *Id.* (internal citations and quotations omitted). The defendants do not argue that such circumstances are present in this case; nor do they claim they would be prejudiced by the application of the *"prima facie"* test. In fact, the defendants

nowhere advocate for the application of any standard other than the *"prima facie"* test. Thus, there is no reason for me to hold Moldflow to a higher evidentiary burden on the jurisdictional issue at this stage of the litigation. *Cf. Daynard*, 290 F.3d at 51 (upholding the district court's application of the *"prima facie"* test on the ground that the defendant "ma[de] no attempt to challenge the applicability of [that] approach").

**(b) Applicable Law**

■ Determining whether a federal court has personal jurisdiction over a defendant typically requires a two-prong analysis. *See Foster–Miller*, 46 F.3d at 144; *Silent Drive, Inc. v. Strong Industries, Inc.*, 326 F.3d 1194, 1200–01 (Fed. Cir.2003). First, the court must decide if the long-arm statute of the state in which it sits confers jurisdiction over the defendant. *See id.* If the defendant's contacts with the forum state satisfy the requirements of the long-arm statute, the court must then address whether the exercise of jurisdiction over the defendant comports with the strictures of constitutional due process. *See id.* The highest court in Massachusetts has concluded, however, that the scope of Massachusetts's long-arm statute is coextensive with federal due process requirements. Thus, federal courts in Massachusetts may "sidestep the statutory inquiry and proceed directly to the constitutional analysis . . . ." *Daynard*, 290 F.3d at 52 (citing *"Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361 Mass. 441, 280 N.E.2d 423 (1972)); *see also HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1307 (Fed.Cir.1999) ("In interpreting a long-arm statute this court defers to the forum-state's highest court."). Conse-

quently, the outcome of the present motion will turn on the jurisdictional limitations of the Due Process Clause of the Constitution of the United States.

■ Because Moldflow's underlying claim alleges patent infringement, Federal Circuit law governs the adjudication of Simcon's motion to dismiss. *See Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation*, 297 F.3d 1343, 1348 (Fed.Cir.2002) ("Federal Circuit law governs the issue of personal jurisdiction in this patent-related case."); *Hildebrand v. Steck Mfg. Co., Inc.*, 279 F.3d 1351, 1354 (Fed.Cir.2002) ("We apply Federal Circuit law to determine whether the district court properly exercised personal jurisdiction over out-of-state defendants in patent infringement cases.").

**(c) Due Process Requirements for Personal Jurisdiction**

In *International Shoe Co. v. Washington*, the Supreme Court held that a court can only exercise personal jurisdiction over nonresident defendants who have at least "minimum contacts" with the forum in which they are sued, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations and internal quotations omitted).[1] Thus, to oppose the motion to dismiss successfully, Moldflow must show that Simcon has "minimum contacts" with Massachusetts.

The degree of activity in the forum state needed to satisfy the "minimum contacts" requirement depends on the basis for the lawsuit. In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, the Supreme Court

---

**1.** Because Moldflow's claim for patent infringement raises a federal question, "the due process requirements of the Fifth Amendment are at issue." *Deprenyl*, 297 F.3d at 1350. While *International Shoe* involved the due process clause of the Fourteenth Amendment, the Federal Circuit has applied *International Shoe* and its progeny to Fifth Amendment due process cases arising under federal patent law. *See id.*

observed that "when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum, the State is exercising 'specific jurisdiction' over the defendant." 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Conversely, "[w]hen a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant." *Id.* at 414–15 n. 9, 104 S.Ct. 1868. As one might expect, the "minimum contacts" test requires a stronger connection between the defendant and the forum state to establish general jurisdiction than to show specific jurisdiction. *See id.* at 414–16, 104 S.Ct. 1868; *see also 3D Systems, Inc. v. Aarotech Laboratories, Inc.,* 160 F.3d 1373, 1378 n. 3 (Fed.Cir.1998). Because Moldflow argues in the alternative for both general and specific jurisdiction, I will discuss whether Simcon's contacts with the Commonwealth satisfy either basis for in personam jurisdiction.

### i. General Jurisdiction

To be subject to general personal jurisdiction, a defendant must have "continuous and systematic general business contacts" with the forum state. *See Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868; *see also Deprenyl,* 297 F.3d at 1350 ("Where a defendant's contacts are continuous and systematic, due process permits the exercise of general jurisdiction."). The plaintiffs argue that Simcon's activity in Massachusetts was sufficiently "continuous and systematic" to confer general jurisdiction in this court. They say that the evidence uncovered during discovery shows that Simcon "has been regularly providing services in Massachusetts since 1994." Plaintiffs' Second Opposition at 13.

The evidence the plaintiffs rely on, however, establishes only that Simcon has made two sales totaling approximately $7,700 to Massachusetts companies during the past ten years, and that in the month this action was commenced, Kruse Analysis engaged in "preliminary marketing efforts" on Simcon's behalf, which included sending promotional "flyers" advertising Simcon's software products to eleven Massachusetts companies. The plaintiffs do not claim that Simcon has offices, representatives, realty, personalty, bank accounts, or any other presence in the Massachusetts; nor do the plaintiffs point to a single Massachusetts company that ever used Simcon's services more than once. The two sales Simcon made in Massachusetts were to two different companies and occurred almost ten years apart. These isolated and sporadic contacts with the forum do not constitute a "continuous and systematic" business presence in Massachusetts, and even considered in conjunction with Simcon's one time marketing effort, they are insufficient to subject Simcon to general jurisdiction within Massachusetts. *See Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868 (refusing to find general jurisdiction in a case where the defendant's contacts with the forum state were far greater than Simcon's contacts with Massachusetts).

### ii. Specific Jurisdiction

Unlike the standard for claims of general jurisdiction, due process does not require a plaintiff asserting specific jurisdiction to show that a defendant's contacts with the forum state are "continuous and systematic." Indeed, the Federal Circuit has acknowledged that specific jurisdiction may be based on a defendant's "isolated or sporadic" activity within the forum state. *See Silent Drive,* 326 F.3d at 1200 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–73, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). However, there are other criteria that must be met before a court may con-

stitutionally exercise specific personal jurisdiction over a defendant. The Federal Circuit has a three-prong "minimum contacts" test for determining whether specific jurisdiction exists. Under that test, I must determine in this case: "(1) whether the defendant[s] purposefully directed [their] activities at residents of the forum, (2) whether the claim arises out of or relates to those activities, and (3) whether assertion of personal jurisdiction is reasonable and fair." *3D Systems*, 160 F.3d at 1378 (citing *Burger King*, 471 U.S. at 472, 476–77, 105 S.Ct. 2174); *see also Akro Corp. v. Luker*, 45 F.3d 1541, 1545–46 (Fed.Cir.1995). The plaintiffs' contend that they have satisfied the requirements of this test.

■ First, they argue that Simcon's marketing activities were purposefully directed at Massachusetts residents. Because the defendants' representative, Kruse Analysis, purposefully sent sales material promoting Simcon's products directly to companies residing in Massachusetts, I agree with the plaintiff's characterization of Simcon's activities, and hold that the first-prong of the specific jurisdiction test is met. *See 3D Systems*, 160 F.3d at 1378 (concluding that a defendant who sent promotional letters and price quotations to residents of the forum state purposefully directed its activities at those residents).

The second prong of the Federal Circuit's "minimum contacts" test presents a more difficult issue, because it requires an examination of the underlying patent infringement claim. To establish that this lawsuit "arises out of or relates to" Simcon's contacts with Massachusetts, the plaintiffs must make a *prima facie* showing that their claim for patent infringement is connected to Simcon's activity within the Commonwealth. *See Burger King*, 471 U.S. at 472–73, 105 S.Ct. 2174 (holding that, to establish specific jurisdiction, a plaintiff must show that "the litigation results from alleged injuries that arise out of or relate to [ ] activities [within the forum state]"); *see also HollyAnne Corp.*, 199 F.3d at 1308 n. 4 ("[T]he test is whether the activity in the forum state is *a* basis for the cause of action") (emphasis in original). According to the plaintiffs, the evidence of record demonstrates that they have a well-founded claim based on conduct by Simcon in Massachusetts that constituted patent infringement.

The plaintiffs first assert that the advertising activities of Kruse Analysis in Massachusetts, on behalf of Simcon, constituted "offers to sell" Simcon's allegedly infringing products in violation of 35 U.S.C. § 271(a) and thus are sufficient to support the exercise of jurisdiction over the defendants in this state. *See id.* at 1308 (recognizing that "offers to sell" violate § 271(a) and hence are sufficient to establish specific personal jurisdiction). The plaintiffs point out that Kruse Analysis sent the promotional materials directly to specific Massachusetts companies, and that those materials included pricing and product information on Simcon's allegedly infringing software. The plaintiffs argue that, under the Federal Circuit's reasoning in *3D Systems, Inc. v. Aarotech Laboratories, Inc.*, this activity is sufficient to satisfy the "offers to sell" language of 35 U.S.C. § 271(a). *See* 160 F.3d 1373, 1379 (Fed.Cir.1998).

In *3D Systems*, the court concluded that, "[a]s a matter of federal statutory construction, the price quotation letters can be regarded as 'offer[s] to sell' under § 271 based on the substance conveyed in the letters, *i.e.*, a description of the allegedly infringing merchandise and the price at which it can be purchased." *Id.* Based on this interpretation of § 271(a), the court concluded that the plaintiff's claim for patent infringement arose out of the defendant's "actions of sending price quotation

letters to California residents," and that the second-prong of the specific jurisdiction test therefore was met. *Id.* Moldflow contends that the promotional materials sent to Massachusetts on Simcon's behalf were identical in kind to those described by the court in *3D Systems*, and that the resolution of the jurisdictional issue in this case is consequently controlled by the Federal Circuit's holding in that case.

To the extent that it is still good law, the interpretation of § 271(a) in *3D Systems* strongly supports the conclusion that the product and pricing information sent by Simcon constituted "offers to sell" the allegedly infringing software to companies in Massachusetts. *3D Systems*, however, is not the Federal Circuit's final word on the subject. Simcon has directed my attention to a later Federal Circuit case that also addresses the meaning of the term "offers to sell" as it is used in § 271(a). *See Rotec Industries, Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1251 (Fed.Cir.2000). In *Rotec*, the Federal Circuit revisited the "offers to sell" language in light of the Supreme Court's decision in *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (Nov. 10, 1998). While *Pfaff* involved § 102(b) the Patent Act of 1952 ("Patent Act"), the court in *Rotec* acknowledged the Supreme Court's method of interpreting the statutory language according to the "the norms of traditional contract law," and stated that the same method should be used to determine the meaning of the "offers to sell" language of § 271(a). *See Rotec*, 215 F.3d at 1254–55 ("[W]e similarly define § 271(a)'s 'offer to sell' liability according to the norms of traditional contractual analy-

sis.").[2] Following the reasoning in *Rotec*, the defendants argue that I should interpret the phrase "offers to sell" "according to its ordinary meaning in contract law, as revealed by traditional sources of authority." *Id.* at 1255. The defendants argue further that "traditional sources of authority" do not support *3D Systems'* broad reading of the "offers to sell" language in § 271(a), and that the defendants' activity in Massachusetts did not amount to "offers to sell," as that term is understood under the ordinary principles of contract law.

The plaintiffs respond that the holding in *3D Systems* survived the Federal Circuit's decision in *Rotec* and still controls the instant case. They point out that in *Rotec*, the Federal Circuit explicitly stated that the reasoning and result in *3D Systems* were consistent with "traditional contractual analysis." *See id.* at 1254. The plaintiffs also correctly note that the facts in *3D Systems* are more directly apposite to the circumstances of this case than are the facts in *Rotec*. The plaintiffs therefore argue that I should follow the specific holding in *3D Systems*, and forgo a broader analysis of whether the promotional materials sent by Simcon would be considered "offers to sell" under traditional contract law.

While the plaintiffs are correct that *Rotec*, in dicta, specifically reaffirms *3D Systems*, I am not persuaded that the holding in *3D Systems* is dispositive here. First, the *Rotec* court squarely held that the phrase "offers to sell," as used in § 271(a), was to be interpreted "according to the norms of traditional contractual analysis." *Id.* at 1254–55. By contrast, the court in

**2.** By treating the term "offers to sell" under § 271(a) of the Patent Act as equivalent to the term "on sale" under § 102(b), *Rotec* is in direct conflict with *3D Systems*. *See 3D Systems*, 160 F.3d at 1379 n. 4 (holding that " 'offer to sell' under § 271 cannot be treated as equivalent to 'on sale' under § 102(b)"

because of the differing policy reasons for the inclusion of the two terms); *see also Elan Corp., PLC v. Andrx Pharmaceuticals, Inc.*, 272 F.Supp.2d 1325, 1339 n. 5 (S.D.Fla.2002) (recognizing the conflict and adopting the approach advocated in *Rotec* ).

*3D Systems* expressly rejected the idea that the statutory language of § 271(a) should be interpreted according to ordinary principles of contract law. *See 3D Systems*, 160 F.3d at 1379 (holding that "the tort of patent infringement due to an 'offer to sell' [under § 271(a) ] is a federal statutory creation which is not limited by California contract law"). Because the Federal Circuit's interpretation of § 271(a) in *3D Systems* did not rely on "norms of traditional contractual analysis," as required under its later decision in *Rotec*, that case does not control the result to be reached here.

In addition, *3D Systems* was decided just two days after the Supreme Court issued its decision in *Pfaff*, and consequently does not discuss that opinion's impact on the Federal Circuit's interpretation of § 271(a). *See generally 3D Systems*, 160 F.3d 1373. *Rotec*, on the other hand, explicitly extends the Supreme Court's reasoning in *Pfaff* to the Federal Circuit's interpretation of § 271(a), and for that reason concludes that § 271(a) must be read according to traditional principles of contract law. *See Rotec*, 215 F.3d at 1254–55. Because it effectively predated the Supreme Court precedent that formed the basis of the Federal Circuit's decision in *Rotec, 3D Systems* does not guide the resolution of the present jurisdiction question.

Finally, and perhaps most importantly, since deciding *Rotec*, the Federal Circuit and other courts have directly employed ordinary principles of contract law to interpret the meaning of the term "offers for sale" under federal patent law. In *Group One, Ltd. v. Hallmark Cards, Inc.*, the Federal Circuit reiterated "that the question of whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law, *to be analyzed under the law of contracts as generally understood*." 254 F.3d 1041, 1047 (Fed.Cir.

2001) (emphasis added). The court then proceeded to apply traditional principles of contract law to determine whether the defendant made a commercial offer to sell a patented invention. *Id.* at 1047–48; *see also Elan Corp., PLC v. Andrx Pharmaceuticals, Inc.*, 272 F.Supp.2d 1325, 1338–40 (S.D.Fla.2002) (analyzing traditional sources of contract law to define "commercial offer for sale" under § 102(b) of the Patent Act). The analysis in *Group One* confirms that I must employ established principles of contract law to assess whether the promotional materials Simcon sent to Massachusetts companies qualified as "offers to sell."

The question that now arises is what are the traditional sources of authority on contract law? In *Group One*, the Federal Circuit stated that "[a]s a general proposition, we will look to the Uniform Commercial Code ('UCC') to define whether … a communication or series of communications rises to the level of a commercial offer for sale." 254 F.3d at 1047. The problem, however, is that the term "offer" is nowhere defined by the UCC. *See Elan Corp.*, 272 F.Supp.2d at 1339 ("Unfortunately, the Uniform Commercial Code does not define 'offer,' and courts must resort to extra-Code contract law … to determine whether a party has made an offer.") (internal citation and quotation omitted). Instead, the UCC adopts the common-law definition of the term. *See* LARY LAWRENCE, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2–206:13 ("As 'offer' is not defined by the Code, the common-law definition continues in force."). The Federal Circuit has therefore recognized that "there is a substantial body of general contract law, widely shared by both state and federal courts, to which courts can resort in making these determinations." *Group One*, 254 F.3d at 1048; *see also* LAWRENCE, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2–206:13. According-

**44**

ly, I turn to an examination of generally recognized authorities on the common-law principles of contract law to determine whether Simcon made "offers to sell" its allegedly infringing products in Massachusetts.

One such authority is the RESTATEMENT (SECOND) OF CONTRACTS. The RESTATEMENT defines an "offer" as a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* § 24 (1981); *see also Elan Corp.,* 272 F.Supp.2d at 1339. Similarly, another authoritative source states that "the best short description ... is that an offer creates a power of acceptance in the offeree." ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 1.11 (1964). While these common-law sources may vary slightly in their phrasing, they agree that an offer creates the power of acceptance in the offeree. That is, once an offer has been made, the offeree has the power to accept it and create a binding contract without any further action by the offeror. *See* RESTATEMENT (SECOND) OF CONTRACTS § 24 cmt. a, Reporter's Note.

In order to create the power of acceptance, an offer must be sufficiently definite. *See* CORBIN, CORBIN ON CONTRACTS § 1.11 ("In order to be legally operative and to create a power of acceptance, it is necessary that the offer shall contain all of the terms of the contract to be made."); E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.3 (2d ed. 1998) ("The fact that a proposal is very detailed suggests that it is an offer, while omission of many terms suggests that it is not."). Conversely, a communication that does not contain specific and definite terms is usually treated as an advertisement or a solicitation, and not as an offer. *See* LAWRENCE, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2–206:20 (summarizing a case that held that "[a] letter from a seller was not an offer

which could be accepted when it stated that it was a 'price quotation' and stated that specified goods were available at specified prices, but did not contain any language indicating that an offer was being made, or contain any statement of quantity, time of delivery, or terms of payment") (footnote omitted).

Here, the record shows that Kruse Analysis contacted several Massachusetts companies by sending them Simcon's promotional materials in the form of "flyers." These materials contained a description of the allegedly infringing software as well as some pricing information. However, the flyers lacked other terms necessary to create the power of acceptance on the part of the recipients. Specifically, the materials did not include information about quantity, time of delivery, or terms of payment. Thus, none of the companies that received the promotional materials could contractually bind Simcon without at least some additional negotiation as to those terms. Because the materials Simcon distributed lacked terms that are essential to an enforceable contract, I hold that those materials were not sufficiently definite to create the power of acceptance and hence were not "offers to sell" under § 271(a). This view is consistent with the Federal Circuit's decision in *Group One,* which affirmed the district court's conclusion that communications that lacked specific terms such as price and quantity were not "offers to sell" under federal patent law. *See Group One,* 254 F.3d at 1047–48.

Because I conclude that they are not "offers to sell," Simcon's promotional activities in Massachusetts do not confer specific jurisdiction in this court to adjudicate the plaintiffs' infringement claims.

■ The plaintiffs offer an alternative rationale to support their contention that their patent infringement claims are related to Simcon's contacts with Massachu-

setts. The plaintiffs assert that a documented sale by Simcon to Tyco Healthcare in Mansfield, Massachusetts included the provision of data generated with one of Simcon's allegedly infringing software programs and therefore constituted patent infringement under 35 U.S.C. § 271(g).

Like § 271(a), 35 U.S.C. § 271(g) defines infringing activity prohibited by federal patent law. It states, in pertinent part, that "[w]hoever without authority imports into the United States . . . a product which is made by a process patented in the United States shall be liable as an infringer . . . ." 35 U.S.C. § 271(g). Moldflow argues, in substance, that the data generated by the allegedly infringing software was a "product" of the patented software modeling process, and that the importation of that data into the United States consequently constituted patent infringement under § 271(g). Because the data went to a Massachusetts company, the plaintiffs argue, Simcon committed an act of infringement in this state and the patent infringement claim accordingly arose out of Simcon's contacts with the forum.

While there is a dispute between the parties over whether the invoice the plaintiffs rely on accurately describes the method that was used to generate the data, I must view the evidence before me, under the *prima facie* standard, in the light most favorable to the party opposing the motion to dismiss for lack of personal jurisdiction. *See Boit,* 967 F.2d at 675 ("In determining whether a *prima facie* showing has been made, the district court is not acting as a factfinder. It accepts properly·supported proffers of evidence by a plaintiff as true."). I therefore· assume for purposes of this motion that the invoice accurately reflects the transaction to which it relates, and that Simcon did use the allegedly infringing technology to provide services to a Massachusetts company.

Even so, I conclude that Simcon's sale to Tyco Healthcare cannot serve as a basis for the plaintiffs' patent infringement claim, because the data information provided in that sale was not a "product" as the term is used in § 271(g). That conclusion is based on a recent Federal Circuit case, which squarely held "that infringement under 35 U.S.C. § 271(g) is limited to physical goods that were manufactured and does not include information generated by a patented process . . . ." *Bayer AG v. Housey Pharmaceuticals, Inc.,* 340 F.3d 1367, 1368 (Fed.Cir.2003). Because the plaintiffs cannot ground their infringement action on Simcon's sale of data to Tyco Healthcare, they cannot· claim that· this lawsuit arises out of or is related to the sale to Tyco.

For the reasons outlined above, the plaintiffs have failed to show that their patent infringement claims "arise out of or relate to" Simcon's contacts with the forum state. *See Burger King,* 471 U.S. at 472–73, 105 S.Ct. 2174. The plaintiffs' inability to meet its burden on the second-prong of the Federal Circuit's specific jurisdiction test makes unnecessary any discussion of the third-prong of the test. Likewise, no discussion of the venue issue raised by the defendants is necessary.

## IV. Conclusion

Because this court cannot constitutionally exercise either general or specific personal jurisdiction over the defendants, Simcon's motion to dismiss for lack of personal jurisdiction is GRANTED.

IT IS SO ORDERED.